UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DENTA TADESSE,

Plaintiff,

v.

SOCIAL SECURITY ADMINISTRATION, COMMISSIONER,

Defendant.

Case No. 18-cv-07643-JST

**ORDER REMANDING FOR FURTHER PROCEEDINGS**

Re: ECF No. 40

This case is now before the Court on remand from the Ninth Circuit.  ECF No. 40.  The Court will VACATE its March 31, 2020 order granting the Commissioner's motion for summary judgment and REMAND the case to the Commissioner for further proceedings.

I.      BACKGROUND

Plaintiff Denta Tadesse alleges that he has been disabled since January 29, 2014, when he visited the emergency room for shoulder pain caused by a motorcycle accident several months earlier.  Administrative Record (AR) 69, 342-45.[1]  He complained the pain "prohibit[ed] him from full range of motion."  *Id.* at 356-59.  Dr. Melissa Clark examined Tadesse and found that he had likely torn his rotator cuff.  *Id.*  Dr. Clark gave Tadesse a sling and prescribed a series of exercises.  *Id.*  Dr. Clark also recommended that Tadesse follow up with his primary care physician and informed him that he may need an MRI and orthopedic care.  *Id.*

Tadesse returned to the emergency room four days later.  *Id.* at 276.  His shoulder was worse, and he had a fever.  *Id.* at 345-56.  Tadesse was admitted for cellulitis in his left shoulder and prescribed Vicodin, Motrin, vancomycin, and antibiotics.  *Id.*  Tadesse did not improve, so

---

[1] The Administrative Record can be found at ECF No. 19.

United States District Court
Northern District of California

doctors took an MRI.  *Id.*  It revealed that Tadesse's left shoulder was inflamed, infected, and covered in an abscess, which limited his use of the shoulder, caused pain, and put him at risk for necrotizing fasciitis – a potentially fatal bacterial infection that could spread quickly through his body.  *Id.*  The attending physician noted that Tadesse might need surgery.  *Id.*  The doctors performed diagnostic testing, which revealed that Tadesse also had HIV, latent syphilis, Hepatitis C, and a serious infection called MRSA bacteremia.  *Id.* at 328.  Tadesse was "very emotional" and "upset" about these findings.  *Id.* at 277.

Tadesse remained in the hospital for four days before being transferred to the CPMC Pacific Campus to have the abscess on his shoulder drained.  *Id.* at 276.  After the surgery, Tadesse remained in the hospital for a few days, but then left against medical advice because the medication the doctors had given him caused extreme vomiting and nausea.  *Id.* at 336-38.  Doctors recommended Tadesse get a primary care physician to treat his HIV infection and prescribe him medicine for syphilis.  *Id.*  They then referred him to an HIV clinic at San Francisco General Hospital.  *Id.*  After his discharge, however, Tadesse did not seek treatment for HIV or syphilis.  *Id.*  He also did not see a primary care doctor until he met with Dr. Joanna Eveland five months later, in July.  *Id.*  Nevertheless, Tadesse's shoulder improved.  *Id.*

On August 23, 2014, Tadesse filed for Social Security Disability Insurance Benefits (SSDI).  *Id.* at 76, 98.  He completed his application on September 29, 2014.  *Id.* at 209-13.  The application listed three impairments: shoulder pain, HIV, and Hepatitis C.  *Id.* It did not list mental disabilities or depression.  *Id.* In January 2015, doctors from the Social Security Administration (SSA) reviewed Tadesse's SSDI application and found him not disabled because he had not attended the medical examination.  *Id.* at 69-75.  The SSA then denied his application and Tadesse filed for reconsideration, claiming that he had not known about the required appointment.  *Id.* at 110.

Before Tadesse's application was reconsidered, he met with Dr. Rose Lewis.  *Id.* at 452-56.  Dr. Lewis conducted an in-person comprehensive medicine evaluation, during which she reviewed Tadesse's physical symptoms, including those from the motorcycle accident, and his medical records.  *Id.* at 452-53.  Dr. Lewis did not evaluate Tadesse's mental health or mental

health history.  *Id.* at 452-56.  She found that Tadesse could stand and walk for up to six hours; carry 50 pounds occasionally and 25 pounds frequently; climb ladders, scaffolds, and ropes frequently and all other postural activities without limitation; and reach overhead frequently.  *Id.* at 471.  She found that his only workplace limitation was "around heavy machinery because of the decreased range of motion" in his shoulder.  *Id.* at 471.

The following month, Dr. J. Berry of the SSA reviewed Tadesse's medical records to determine whether Tadesse was disabled.  *Id.* at 69, 78-97.  Based on his review, Dr. Berry concluded that Tadesse's symptoms were "partially credible" because the symptoms were consistent with the medical evidence in his file, but the severity of the symptoms was "not supported."  *Id.* at 83.  Dr. Berry determined that Tadesse was not disabled because he could sit, stand, kneel, crouch, and only experienced limits in reaching in climbing.  *Id.* at 86, 94-95.  Dr. Berry did not evaluate or review Tadesse's mental limitations.  The day after Dr. Berry's review, the SSA denied Tadesse's application for benefits.  *Id.* at 110.

Following the denial of benefits, Tadesse attended a number of appointments with his primary care doctor, Dr. Joanna Eveland, and his therapist, Juan Cabrera.  *Id.* at 130, 459-513. During the earliest of these appointments, Dr. Eveland diagnosed Tadesse with HIV and Hepatitis C and gave him a letter to allow him to receive resources from the AIDS emergency fund.  *Id.* at 130-31, 462, 488-501.  Around this time, though, Tadesse first began struggling with homelessness.  *Id.* at 130, 462.  He was reluctant to begin HIV treatment until his housing situation stabilized.  *Id.* He was also skeptical of Western medicine, possibly because of his experience with side effects after his shoulder surgery.  *Id.*  Around the end of 2015, Tadesse's housing situation continued to be unstable, and in January 2016, he was arrested for trespassing. *Id.* at 126-28.

A few days after that arrest, Tadesse met with Cabrera.  *Id.* at 483.  The therapy sessions with Cabrera focused primarily on Tadesse's homelessness.  *Id.*  Cabrera noted that Tadesse had become "increasingly angry and somewhat mistrusting of the agencies and people" that are "supposed to help him" since becoming homeless.  *Id.*  In particular, following Tadesse's arrest, he had come "close to snapping."  *Id.*  Cabrera also observed that Tadesse had been "isolating"

because he was ashamed of his condition and could not concentrate well because he was "worried about basic things like getting food." *Id.* Since his HIV diagnosis and becoming homeless, Tadesse lost much of his enjoyment in life and was "less hopeful and motivated" than ever. *Id.* Tadesse struggled with "everyday issues of discrimination that seemed to bring out past wounds related to personal mistreatment." *Id.*

While he met with Cabrera, Tadesse continued to meet with Dr. Eveland – indeed, throughout February and March 2016, Tadesse attended appointments with either Dr. Eveland or Cabrera more than twice per week every week. *Id.* at 473, 476-83, 511-13. Dr. Eveland continued to press Tadesse on HIV treatment, but he continued to resist because his housing was unstable. *Id.* at 479. Both Dr. Eveland and Cabrera noted that Tadesse was friendly, cooperative, forthcoming, well-groomed, and articulate. *Id.* at 468, 483. But he regularly arrived late to or missed appointments entirely. *Id.* at 468.

Dr. John Brim examined Tadesse on May 23, 2016, focusing on Tadesse's mental limitations. *Id.* at 503. Dr. Brim found that Tadesse did "not met the criteria for major affective disorder or generalized anxiety disorder" because his depression and anxiety seemed to be "byproducts" of "angry outbursts." *Id.* Dr. Brim further noted that Tadesse blamed conflicts on others' bad behaviors because Tadesse was "rigid[ly] egocentric[]" and had difficulties "understanding other people's motivations." *Id.* at 504. Dr. Brim diagnosed Tadesse with narcissistic personality, intermittent explosive disorder, and an adjustment disorder with a depressed and anxious mood. *Id.* He based these diagnoses on Tadesse's statement that he would not care if his refusal to get HIV treatment put other sexual partners at risk and his "extreme and disproportionate anger when others don't behave as he feels they should." *Id.* Dr. Brim informed Tadesse that he should primarily treat his disorders using psychotherapy but also suggested oxcarbazepine, a trial drug, for anger issues. *Id.* at 504-05. Dr. Brim informed Tadesse of its possibly life-threatening side effects, but Tadesse pressed for medicine despite his previous assertion that he did not believe in Western medicine. *Id.* at 505. Dr. Brim speculated that Tadesse may have wanted medication because Tadesse had a disability application pending and wanted to maintain his housing. *Id.* at 504.

1    In July 2016 – two years after she first saw him – Dr. Eveland completed a Treating

2    Source Evaluation Form for Psychiatric Conditions. *Id.* at 468-71. Her findings were consistent

3    with her previous treatment notes and Cabrera's therapy session notes. *See id.* Dr. Eveland found

4    that Tadesse had begun feeling depressed after his HIV and Hepatitis C diagnosis, and that he

5    experienced "hopelessness" as well as "vague suicidal thoughts, anhedonia, high anxiety, low

6    energy, low motivation, [] poor concentration," increased irritability, and anger. *Id.* She also

7    noted that after Tadesse lost his housing in 2015, his pride and depression led him to isolate. *Id.*

8    During the evaluation appointment itself, Dr. Eveland found Tadesse to be "friendly, cooperative,

9    and forthcoming" with "good insight into his anger and his difficulty tackling his situation," but

10   that he tended to anger quickly. *Id.* She believed his "low sense of hope and motivation" made it

11   difficult for Tadesse to "carry on prolonged activity" and that his volatility and angry outbursts

12   would make it difficult for Tadesse to work with supervisors, co-workers, or the public. *Id.* Thus,

13   Dr. Eveland believed Tadesse "would struggle in any work environment with pace and

14   persistence" and diagnosed him with major depressive disorder, HIV, Hepatitis C, and a facial

15   pain condition called acute maxillary sinusitis. *Id.* Dr. Eveland reported that Tadesse's symptoms

16   had been present for more than two years and would not likely improve within the following

17   twelve months. *Id.*

18   Tadesse's SSA hearing took place a month later, on September 14, 2016. *Id.* at 49-68.

19   Tadesse testified about his homelessness, shoulder pain, and difficulties that stemmed from

20   immigrating to the U.S. from Ethiopia in the 1980s. *Id.* at 57-58. During the hearing, the

21   Administrative Law Judge (ALJ) posed two hypotheticals to the vocational expert. *Id.* at 66. The

22   first asked whether someone with only Tadesse's physical limitations would be able to perform

23   work as a restaurant manager or waiter – the jobs Tadesse had held before January 2014. *Id.* The

24   vocational expert testified that they would. *Id.* The ALJ then asked whether that person would be

25   able to perform the work if they were unable to work with the public, missed two unscheduled

26   days per month, and was off-task 25 percent of the time. *Id.* at 66-67. The ALJ testified that that

27   work as a manager or waiter would not be available to that person. *Id.*

28   The ALJ denied Tadesse's application on October 13, 2016. *Id.* at 10, 18-27. Tadesse

United States District Court
Northern District of California

1    requested review of the decision, but the Appeals Council denied the request on November 7,

2    2016. *Id.* at 2. Tadesse filed his complaint in this Court on December 19, 2018. ECF No. 1. The

3    parties filed cross-motions for summary judgment, and on March 31, 2020, this Court granted the

4    Commissioner's motion and denied Tadesse's motion. ECF No. 36. Tadesse appealed, and the

5    Ninth Circuit reversed and remanded for further consideration of Tadesse's mental limitations.

6    ECF No. 40.

7    **II.    JURISDICTION**

8          This Court has jurisdiction under 42 U.S.C. § 405(g).

9    **III.   LEGAL STANDARD**

10         A court may set aside the SSA's denial of benefits only if the denial "is not supported by

11   substantial evidence in the record or if it is based on legal error." *Merrill ex rel. Merrill v. Apfel*,

12   224 F.3d 1083, 1084-85 (9th Cir. 2000); *see* 42 U.S.C. § 405(g) ("The findings of the

13   Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

14   conclusive[.]"). Substantial evidence is that evidence which a reasonable mind "might" find

15   "adequate to support a conclusion." *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (citing

16   *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). To decide whether substantial evidence exists,

17   the reviewing court considers the administrative record "in its entire[ty]" and weighs evidence that

18   supports and detracts from the ALJ's conclusion. *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th

19   Cir. 1992). If the evidence supports multiple rational conclusions, the reviewing court "must defer

20   to the decision of the ALJ," *id.* at 1258, but the reviewing court cannot affirm the ALJ on grounds

21   the ALJ did not rely on to make its decision. *Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir.

22   2001) (citation omitted).

23   **IV.   DISCUSSION**

24         **A.    SSI Benefits Framework**

25         A five-step framework governs whether a claimant is disabled. *See* 20 C.F.R. §§

26   404.1520, 416.920; *Maxwell v. Saul*, 971 F.3d 1128, 1130 n.2 (9th Cir. 2020). The burden is on

27   the claimant for steps one through four but shifts to the Commissioner at step five. *Maxwell*, 971

28   F.3d at 1130 n.2.

*United States District Court*
*Northern District of California*

6

1       The first step in the framework asks the ALJ to determine whether the claimant is engaged

2 in substantial gainful activity.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).  If so, the claimant

3 cannot be found disabled.  *See* 20 C.F.R. §§ 404.1572, 416.972.  If not, the ALJ proceeds to step

4 two.

5       At step two, the ALJ determines whether the claimant's impairment is sufficiently severe

6 to limit their ability to work.  *Buck v. Berryhill*, 869 F.3d 1040, 1048 (9th Cir. 2017).  The step-

7 two inquiry is a "de minimis screening" to weed out "groundless" claims of impairment.  *Smolen*

8 *v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).   An ALJ should find an impairment "not severe"

9 only if the medical evidence clearly establishes that the impairment has no more than a minimal

10 effect on the individual's ability to work.  *Webb*, 433 F.3d at 686.  If the impairment is severe, the

11 ALJ continues to step three.

12       Step three requires the ALJ to determine whether the impairment is included on the

13 impairment list of the CFR Appendix 1 and whether it meets the 12-month duration requirement.

14 *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  If a claimant suffers from multiple impairments, the

15 ALJ should consider the impairments together to determine whether they meet or equal the

16 characteristics of a listed impairment.  *See* 20 C.F.R. §§ 404.1526(b)(3), 416.926(b)(3); *see also*

17 *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990).  If the impairment is listed and has

18 persisted or is expected to persist for more than 12 months, the ALJ proceeds to step four.

19       At step four, the ALJ determines, considering all impairments in combination, the

20 claimant's residual functioning capacity (RFC).  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f); *Buck*,

21 869 F.3d at 1048.  Given the claimant's RFC, the ALJ determines whether the claimant can still

22 perform their past relevant work.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f); *Buck*, 869 F.3d at

23 1048.  If the ALJ determines that the claimant cannot perform their past relevant work, the ALJ

24 proceeds to the fifth step.

25       At the fifth step, the burden shifts to the Commissioner to establish that the claimant

26 cannot perform any other substantial gainful work.  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g);

27 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999)).  The fifth step can only be satisfied

28 if there are "a significant number of jobs in the national economy" the claimant can perform.  *Ford*

*v. Saul*, 950 F.3d 1141, 1149 (9th Cir. 2020).[2]  The Commissioner may establish the existence of

these jobs through vocational expert testimony or review of the Medical-Vocational Guidelines.

*Maxwell*,  971 F.3d at 1130 n.2.  If the Commissioner cannot establish the availability of other

substantial gainful work, they must award benefits.  *Reddick v. Chater*, 157 F.3d 715, 729-30 (9th

Cir. 1998); *Sisco v. U.S. Department of Health and Human Services*, 10 F.3d 739, 745 (10th Cir.

1993).

> **B.     ALJ Errors**

The Ninth Circuit identified five errors in the ALJ's decision and remanded to this Court

"for further findings regarding Tadesse's mental limitations."  ECF No. 40 at 5.  These

deficiencies are (1) the step-two finding that Tadesse's depression was nonsevere, (2) the ALJ's

rejection of Dr. Joanna Eveland's mental health functionality assessment, (3) the ALJ's failure to

address the observations and opinions of Dr. John Brim and Juan Cabrera, (4) the ALJ's

discounting for Tadesse's testimony about his subjective symptoms, and (5) the ALJ's assessment

of RFC that contains no mental limitation.  *Id.* at 1-5.

> **1.     Nonsevere Depression**

The ALJ found at step-two that Tadesse's mental limitation – depression – was not severe.

AR 20-21.  She based this on her consideration of four functional areas known as "paragraph B"

criteria.  *Id.* at 21.  The paragraph B criteria included daily living, social functioning,

concentration, and episodes of decompensation.  *Id.*  The ALJ found that Tadesse's depression

caused only mild limitation in the first three categories and that there were "no" episodes of

decompensation.  *Id.*  The ALJ based this conclusion on the fact that Tadesse could get dressed, do

household chores, walk his dog and watch Netflix, that he appeared friendly and cooperative

during his doctor's appointments and liked to go out and eat when he had money, liked to watch

movies, and denied suicidal thoughts.  *Id.*

---

[2] "If vocational resources are used, it is SSA policy that, when a decision of not disabled is made, the determination rationale should cite at least three specific occupations that the claimant has the ability to perform along with an affirmative statement . . . that such jobs exist in significant numbers in the national economy."  3 Soc. Sec. Law & Prac. § 43:184 (2022) (citing SSA Program Operations Manual System § DI 25025.030).

United States District Court
Northern District of California

The ALJ's findings do not support the conclusion that Tadesse's depression is nonsevere. Tadesse's treating physician, Dr. Eveland, diagnosed him with major depressive disorder, and another physician, Dr. Brim, found Tadesse to have significant mental limitation.  AR 470, 503-07.  Furthermore, although Tadesse had enjoyed watching Netflix and liked to go to restaurants when he had money, Dr. Eveland's notes show that homelessness and depression had rendered him unable to do those things.  *See id.* at 484-86.  Because the step-two consideration is a "de minimis screening" device for the purpose of weeding out "groundless" claims, *Smolen*, 80 F.3d at 1290, the ALJ should have found Tadesse's mental limitations to be severe at step two.  *See Webb*, 433 F.3d at 688; *see also Fillmore v. Astrue*, 2012 WL 298341 at *20 (N.D. Cal. Feb. 1, 2012) (reversing the ALJ's step-two finding of nonseverity because the opinion of the only physician to evaluate the mental health of the claimant showed the impairment was severe).

### 2.        Rejection of or Failure to Address Mental Health Evidence

The ALJ further erred in discounting or failing to consider Dr. Eveland, Dr. Brim, and Juan Cabrera's findings about Tadesse's mental health in favor of Dr. Berry's evaluation.  An ALJ may only reject the uncontroverted opinion of a physician if the ALJ gives clear and convincing reasons for doing so.  *Ford*, 950 F.3d at 1154.  Because Dr. Berry did not evaluate Tadesse's mental limitations, his opinion does not contradict Dr. Eveland's.  *See* AR 468-71, 503-07; *Popa v. Berryhill*, 872 F.3d 901, 906 (9th Cir. 2017) (finding ALJ erred when "no medical evidence in the record contradict[ed] [doctor's] opinion").  The ALJ did not provide clear and convincing reasons for rejecting Dr. Eveland's opinions.  Rather, the ALJ rejected Dr. Eveland's opinion because it was an evaluation rather than treatment.  AR 33-34.  But the purpose for which an opinion is given is not a basis for rejecting it, so this is not a clear and convincing reason.  *Reddick v. Chater*, 157 F.2d at 1232; *see also Bayliss v. Barnhart*, 427 F.3d 1121, 1216 (9th Cir. 2005) (holding that even "[i]f a treating or examining doctor's opinion is contradicted by another doctor's opinion, the ALJ may only reject [the treating or examining opinion] by providing specific and legitimate reasons that are supported by medical evidence").

Further, while it is true that ALJs may give heavier weight to a treating physician's opinion than an evaluating one, the "rationale" for that rule is that the treating physician is "employed to

cure and has a greater opportunity to know and observe the patient as an individual." *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987).  That does not apply here.  Although Dr. Eveland's mental health evaluation was an evaluation, not a treatment, Dr. Eveland was Tadesse's primary treating physician for two years before she made the mental health evaluation.  AR 273.  She had more opportunity personally to evaluate Tadesse than any other doctor in the record.  And physicians may give competent psychiatric opinions based on clinical observation – which Dr. Eveland performed.  *See Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987); AR 483-85.  In fact, ALJs should reject psychiatric evaluations only in favor of a specialist evaluation, but no specialist evaluation was present here.  *Smolen*, 80 F.3d at 1285.  Instead, the ALJ rejected Dr. Eveland's testimony in favor of Dr. Berry.  AR 25.  But Dr. Berry was also an evaluating physician.  AR 78.  Dr. Berry saw Tadesse only once.  *Id.*  And Dr. Berry only reviewed Tadesse's medical history and tested his physical capabilities, including whether he could sit, kneel, and stand.  *Id.*; *see also Reddick*, 157 F.3d at 728 (finding the ALJ erred by crediting the conclusion of physicians who only evaluated orthopedic factors when the claimant also complained of a chronic fatigue syndrome).  It was thus inappropriate for the ALJ to discount Dr. Eveland's testimony but credit Dr. Berry's.

The ALJ made a similar error in failing to consider Dr. Brim's evaluation.  Though Dr. Brim evaluated Tadesse's mental limitations and diagnosed him with intermittent explosive disorder and narcissistic personality disorder, AR 503-07, the ALJ referenced Dr. Brim's observations only to note that Dr. Brim questioned whether Tadesse's SSID application influenced his desire to get therapy and medication.  AR 25.  The ALJ did not consider Dr. Brim's findings that Tadesse had narcissistic personality disorder, intermittent explosive disorder, or that Tadesse struggled to understand and work with others.  *Id.* at 15-27.  Like Dr. Eveland, though, Dr. Brim was an evaluating physician whose opinions the ALJ could reject only if the ALJ gave clear and convincing reasons for doing so.  *See Ford*, 950 F.3d at 1154.  The ALJ gave no reasons for discounting Dr. Brim's opinions.  *See id.*; *see also Montijo v. Sec'y of Health and Hum. Servs.*, 729 F.2d 599, 602 (9th Cir. 1984) (reversing and remanding because "[t]he administrative law judge made no finding that the doctors lacked credibility or qualifications").  The ALJ should

10

therefore not have discounted them.

Likewise, Juan Cabrera met regularly with Tadesse throughout 2016 to discuss Tadesse's depression and homelessness, but the ALJ referenced Cabrera's notes only insofar as Cabrera found Tadesse to be friendly and forthcoming.  AR 24.  As Tadesse's therapist, Cabrera's notes were "other source" evidence, meaning the ALJ could only discount them if she provided "reasons germane to [Cabrera] for doing so."  *Popa*, 872 F.3d at 906.  The ALJ gave no reasons for discounting Cabrera's testimony, and certainly none that were germane to Cabrera.  *See id.*; AR 25-27; *see also Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (reversing the ALJ erred because they failed to "set forth reasons" for rejecting testimony).  Absent reasons for not doing so, the ALJ therefore should have considered Cabrera's notes.  *See Popa*, 872 F.3d at 906.

Finally, the ALJ erred in discounting Tadesse's subjective testimony.  The ALJ found that the medical evidence could be expected to produce the symptoms alleged, but that the severity of the symptoms was not supported by the medical evidence.  AR 24.  However, "[o]nce the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence."  *Berry v. Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010).  If the claimant has shown evidence that the pain or symptoms could be expected to occur, the ALJ may discount his subjective testimony only if there is evidence of "malingering" or by offering "specific, clear, and convincing reasons for doing so."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  The ALJ did not find evidence of malingering or offer specific, clear, or convincing reasons for rejecting Tadesse's subjective testimony.  Instead, the ALJ found that Tadesse's subjective symptoms were undermined by his reluctance to get treatment for HIV as well as his doctors' observations that he was friendly, forthcoming, and "well-groomed."  *Id.*  But these are not specific, clear, or convincing reasons to reject his testimony.  *See, e.g., id.* (finding the claimant's performance of work that contradicted his symptoms an insufficient reason to reject his testimony); *Leon v. Berryhill*, 880 F.3d 1041, 1046 (9th Cir. 2017) (finding the claimant's failure to significantly describe the symptoms to multiple doctors an insufficient reason to reject testimony).  The ALJ thus erred in discounting Tadesse's symptoms.  Because the ALJ did not

United States District Court
Northern District of California

11

provide adequate reasons for rejecting the evidence of mental impairment, the Court credits that evidence "as a matter of law." *Lester*, 81 F.3d at 834. The Court therefore credits Dr. Eveland's opinion about Tadesse's depression and symptoms, Dr. Brim's observations about Tadesse's ability to interact with others, Cabrera's observations about Tadesse's hopelessness and inability to concentrate, and Tadesse's subjective symptoms.

### 3. Step Four Residual Functioning Capacity

Because the ALJ discredited or failed to consider each of the opinions related to mental health, the ALJ's step-four analysis did not sufficiently consider whether Tadesse's mental limitations would prevent him from performing his past relevant work as a waiter or restaurant manager. *See Lester v. Chater*, 81 F.3d 821, 829 (9th Cir. 1995). Dr. Eveland, Dr. Brim, and Cabrera all found that Tadesse had significant mental limitations. Dr. Eveland found that Tadesse regularly missed appointments, has "difficulty with follow[-]through," experiences vague suicidal thoughts, has low motivation, and tends to isolate because he is embarrassed of his situation. AR 468. She further found that Tadesse has difficulty concentrating, that he is homeless, and that his depression has continued to "worsen with every obstacle." *Id.* She observed that Tadesse's symptoms had persisted for the two years she had known him and that she did not expect them to improve within 12 months. *Id.* at 471. Dr. Eveland felt that "as part of his depression," Tadesse was prone to react violently or give up easily when challenged and that he is unable to maintain a consistent schedule, work activity, or complete tasks. *Id.* at 470.

Dr. Brim did not find that Tadesse suffered from depression but identified the same symptoms as Dr. Eveland. *See id.* at 503-07. Dr. Brim believed that Tadesse's symptoms stemmed not from depression but from narcissism and diagnosed Tadesse with Intermittent Explosive Disorder and Narcissistic Personality Disorder. *Id.* at 505-06. Dr. Brim observed, as did Dr. Eveland, that Tadesse found it difficult to interact with others and reacted with "extreme and disproportionate anger" when others acted differently than Tadesse believed they should. *Id.*

Cabrera's therapy notes showed the same observations. *See* AR 473. Cabrera found Tadesse to be generally friendly and forthcoming, but observed that Tadesse was often "upset," expressed anger, frustration, and shame at his situation, and that "his ability to concentrate [was]

12

1    lower because he [was] worried about basic things like getting food" and "enjoy[ed] life much

2    less." AR 473, 482.  According to Cabrera's notes, Tadesse regularly arrived late or missed

3    appointments entirely.  *Id.* at 473, 482-83.

4           At Tadesse's hearing, the vocation expert testified that there would be no past work

5    available for someone who was unable to work with the public, missed two unscheduled days per

6    month, and was off task for 25 percent of the time.  *Id.* at 66-67.  Based on the opinions of Dr.

7    Eveland, Dr. Brim, and Cabrera, Tadesse would be unable to work with the public, miss multiple

8    unscheduled days per month, and find himself off-task 25 percent of the time.  The Court therefore

9    finds that Tadesse does not have RFC sufficient to perform his past relevant work as a waiter or

10   restaurant manager.

             **4.        Remand for Step Five Analysis**

12          The court has "discretion" to decide whether to remand a case for additional evidence or

13   the award of benefits.  *Reddick*, 157 F.3d at 728.  Remanding to award benefits is acceptable

14   where "(1) the record has been fully developed and further administrative proceedings would

15   serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting

16   evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited

17   evidence were credited as true, the ALJ would be required to find the claimant disabled on

18   remand." *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014).  However, the "proper" decision

19   is, "except in rare circumstances," to allow the agency to conduct additional investigation or

20   provide further explanation.  *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004).

21          Here, the ALJ did not perform a step-five analysis because the ALJ found that Tadesse

22   could perform his past relevant work.  AR at 23-27.  It is possible that, at step five, the ALJ would

23   determine that Tadesse could perform work for which there are a significant number of jobs in the

24   economy.  *See Ford*, 950 F.3d at 1149.  The Court therefore remands the case to the ALJ so that

25   the ALJ may attempt to establish whether such jobs are available.  If the ALJ cannot establish the

26   availability of other substantial gainful work, they must award benefits.  *Reddick v. Chater*, 157

27   F.3d 715, 729-30 (9th Cir. 1998); *Sisco v. U.S. Department of Health and Human Services*, 10

28   F.3d 739, 745 (10th Cir. 1993).

United States District Court
Northern District of California

<div style="text-align: right; writing-mode: vertical">United States District Court
Northern District of California</div>

1

**CONCLUSION**

2      The ALJ erred by finding that Tadesse's mental limitations were nonsevere and failing to

3  consider evidence of his mental limitations.  The Court therefore REMANDS to the ALJ for

4  further findings consistent with this Order.

5      **IT IS SO ORDERED.**

6  Dated:  June 29, 2022

7  _____

8                  JON S. TIGAR
                   United States District Judge